IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

TRENTON BARKHURST, a single person, *Plaintiff/Appellant,*

*v.*

THE KINGSMEN OF ROUTE 66, INC., an Arizona corporation,
*Defendant/Appellee.*

No. 1 CA-CV 13-0166
FILED 5-1-2014

Appeal from the Superior Court in Mohave County
No.  S8015CV201002151
The Honorable Charles W. Gurtler, Judge

**AFFIRMED**

COUNSEL

Moriarity Badaruddin & Booke, L.L.C., Missoula, MT
By Bradley L. Booke
*Counsel for Plaintiff/Appellant*

Brownlee Law Firm, P.C., Phoenix
By Joseph L. Brownlee
*Counsel for Defendant/Appellee*

_____

**OPINION**

_____

Presiding Judge Donn Kessler delivered the opinion of the Court, in which Judge Patricia K. Norris and Judge Maurice Portley joined.

_____

**K E S S L E R**, Presiding Judge:

¶1        Trenton Barkhurst appeals the superior court's order granting summary judgment to The Kingsmen of Route 66, Inc. ('The Kingsmen").  For the following reasons, we agree with the superior court's conclusion that The Kingsmen owed no duty to Barkhurst.  We therefore affirm.

**FACTUAL AND PROCEDURAL HISTORY**

¶2        The Kingsmen is a non-profit organization of local volunteers that annually sponsors, organizes and conducts the Andy Devine Rodeo Days ("Rodeo Days"), a two-day rodeo in Kingman that occurs at the end of "Western Week."  Local businesses host specific events during Western Week, and The Kingsmen assists in any way they can.  In 2009, the Dambar Steakhouse hosted a "Rodeo Dance" and "Best Butt Contest" (collectively, the "Dambar Entertainment") in the evening of the  rodeo's first day.

¶3        To encourage community involvement and tourism in Kingman, The Kingsmen promoted the 2009 Rodeo Days and Western Week on a website.  The website listed the dates and times of the various activities, including the Dambar Entertainment.  The website also stated:

> The Andy Devine Days PRCA Rodeo is in its 25[th] year here in Kingman Arizona, brought to you by the KINGSMEN, a group of local businessmen dedicated to the preservation of our area's ranching and rodeo western heritage . . . .
>
> We invite you to enjoy all of the fun and entertainment brought to Kingman during Western Week, including the dances, parade, chili feed, and of course, the Rodeo!

¶4        Approximately two-and-one-half hours after the Dambar Entertainment ended, two intoxicated patrons, Devore and Fancher, assaulted Barkhurst in the Dambar parking lot.  Devore was under twenty-one years old.  Barkhurst sustained serious injuries.  At least one member of The Kingsmen was at the Dambar acting as a judge during the Dambar Entertainment wearing a Kingsmen shirt.  The member called 911 when he was informed someone was injured in the fight, and he assisted the security guard in a "backup capacity" by "making sure . . . [the fight] had been defused and people were gone."

¶5        Barkhurst filed a complaint for damages against several parties including The Kingsmen, the Dambar and the security provider.  The allegations against The Kingsmen included statutory and common law dram shop liability ("Claims 1 and 2") and negligence claims ("Claim 5").[1]  The Kingsmen successfully moved for summary judgment on all claims against it.  In dismissing Claims 1 and 2, the court found The Kingsmen do not "fall within the dram shop provisions . . . [because] [t]he allegations in [Barkhurst's] complaint do not even reference other than the Dambar that any of the other defendants are licensees or that they have sold or furnished alcohol."  Regarding the negligence claim, the court concluded The Kingsmen owed no duty of care to Barkhurst.

¶6        Barkhurst timely appealed.  We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, and Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1) (2003) and -2101(A)(1) (Supp. 2013).

## DISCUSSION

¶7        Barkhurst argues the court erred in granting The Kingsmen summary judgment on the negligence claim.  The sole issue is whether The Kingsmen owed Barkhurst a duty of care.

¶8        Summary judgment is appropriate "if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law."  *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 482, ¶ 14, 38 P.3d

---

[1]        Barkhurst's complaint also raised claims of premises liability and security liability, but not against The Kingsmen.  Barkhurst also does not appeal the dismissal of the dram shop claims.

12, 20 (2002). We review the grant of summary judgment *de novo*, "viewing the evidence and reasonable inferences in the light most favorable to" Barkhurst. *Andrews v. Blake*, 205 Ariz. 236, 240, ¶ 12, 69 P.3d 7, 11 (2003).

I.    DUTY OF CARE

**¶9**        A negligence claim requires proof of four elements: "(1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages." *Gipson v. Kasey*, 214 Ariz. 141, 143, ¶ 9, 150 P.3d 228, 230 (2007). The threshold issue regarding duty is a question of law determined by the court, and:

> The existence of a duty of care is a distinct issue from whether the standard of care has been met in a particular case. As a legal matter, the issue of duty involves generalizations about categories of cases. Duty is defined as an "obligation, recognized by law, which requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm."

*Id.* at ¶ 10 (quoting *Markowitz v. Ariz. Parks Bd.*, 146 Ariz. 352, 354, 706 P.2d 364, 366 (1985)).

**¶10**        Whether a defendant owes a plaintiff a duty of care does not turn on the foreseeability of injury.[2] *Id.* at 144, ¶¶ 15-17, 150 P.3d at 231. "Duties of care may arise from special relationships based on contract, family relations, or conduct undertaken by the defendant." *Id.* at 145, ¶ 18, 150 P.3d at 232.[3] The formation of a special relationship is often based on some aspect of control. As a general matter, there is no duty to prevent

---

[2]        Barkhurst argues the court improperly applied the foreseeability test rejected by *Gipson*. Our review of the record, however, indicates the court did not base its no-duty conclusion on any inability by The Kingsmen to foresee the risk posed by over-served patrons at the Dambar.

[3]        However, a court evaluating a relationship between parties for purposes of determining the existence of a duty must not engage in a "fact-specific analysis of the relationship," because doing so "conflates the issue with the concepts of breach and causation." *Gipson*, 214 Ariz. at 145, ¶ 21, 150 P.3d at 232.

a third person  from causing physical harm to another unless the defendant stands in a special relationship with the third person or with the victim that gives the victim a right to protection.  Restatement (Second) of Torts § 315 (1965); *see also Gipson*, 214 Ariz. at 145, ¶ 19, 150 P.3d at 232 (explaining that various categorical relationships can give rise to a duty, including special relationships recognized by § 315 of the Restatement (Second) of Torts "that create a duty to control the actions of another").  For example, special relationships include a parent's duty to control a child, a master's duty to control a servant, a landowner's duty to control a licensee, and the duty of caretakers in charge of individuals with dangerous propensities to control those individuals.  Restatement (Second) of Torts §§ 316-19.  "A special or direct relationship, however, is not essential in order for there to be a duty of care."  *Gipson*, 214 Ariz. at 145, ¶ 18, 150 P.3d at 232.  In the absence of a special or direct relationship, public policy considerations may support the existence of a legal obligation. *Id.* at ¶ 22.

¶11        In their summary judgment motion, the Kingsmen presented evidence that it did not sponsor, control, host, organize, pay for, or participate in the Dambar Entertainment except to help advertise the Rodeo Days events and that any of its members who attended the Dambar Entertainment did so in their individual capacity.  The Kingsmen also presented evidence that it did not provide security for the Dambar Entertainment.  In promoting Rodeo Days, the Kingsmen sold sponsorships for Rodeo Days and Dambar, as one of the paid sponsors, was able to hang a Dambar banner at the rodeo.  Barkhurst pointed out that the Kingsmen advertised various businesses like the Dambar which had paid for sponsorships for the Rodeo Days and that several Kingsmen members had attended the Dambar dance dressed in Kingsmen shirts.  Barkhurst claimed  in the superior court and argues on appeal that by organizing the Rodeo Days and promoting the Dambar Entertainment along with the other events during Rodeo Days, The Kingsmen was legally obligated to undertake reasonable measures to ensure intoxicated and underage patrons were not served alcohol at the Dambar.  In other words, Barkhurst argues that mere sponsorship and promotion of Rodeo Days events by the Kingsmen were enough to create a duty by The Kingsmen to protect people attending the Dambar Entertainment, even without evidence that The Kingsmen had any control over the property,

event, or serving of alcohol at that event.[4] Barkhurst relies on three Arizona cases to support his argument. Each of those cases is distinguishable from the issue here in which The Kingsmen did not control the dance or contest at the Dambar or own or lease the property at which those events took place.

¶12 Barkhurst primarily relies on *Estate of Hernandez by Hernandez-Wheeler for & on Behalf of Hernandez v. Arizona Board of Regents*, 177 Ariz. 244, 866 P.2d 1330 (1994). In *Hernandez*, an underage college student drank alcohol at a fraternity party before crashing his car into a vehicle driven by Hernandez. *Id*. at 247, 866 P.2d at 1333. Hernandez suffered severe physical injuries, and brought an action against several parties, including the students, the fraternity, and the Arizona Board of Regents, which owned the property where the party occurred and leased it to the fraternity. *Id*. Hernandez alleged that the Board of Regents was "negligent in continuing to lease the premises to the house corporation when it knew that the fraternity served alcoholic beverages to persons under the legal drinking age," and was "liable both under the doctrine of respondeat superior and for its negligent supervision of [the driver]." *Estate of Hernandez by Hernandez-Wheeler on Behalf of Hernandez v. Arizona Bd. of Regents*, 172 Ariz. 522, 526, 838 P.2d 1283, 1287 (App. 1991), *vacated*, *Hernandez*, 177 Ariz. at 256, 866 P.2d at 1342. The superior court held that the Board of Regents, as a social host, was statutorily immune from liability for serving alcohol to a minor who became intoxicated and injured a third party. *Hernandez*, 177 Ariz. at 247, 866 P.2d at 1333. This court affirmed, but our supreme court reversed, concluding that statutory immunity does not apply to non-licensees who furnish alcohol to underage persons:

> We hold only that the so-called traditional rule—if ever there was one—of non-liability when a non-licensee serves alcohol to minors does not exist in Arizona. We do *not,* in this opinion, lay down any rule of absolute liability for serving alcohol to minors. . . . Arizona courts, therefore, will entertain an action for damages against a non-licensee who negligently furnishes alcohol to those under the legal drinking age when that act is a cause of injury to a third person.

---

[4] In opposing summary judgment, Barkhurst conceded that the Dambar, not The Kingsmen, provided security for the Dambar Entertainment. .

*Id.* at 256, 866 P.2d at 1342.

¶13        Barkhurst points to the Arizona Supreme Court's following statement in *Hernandez*: "We . . . conclude . . . Defendants had a duty of care to avoid furnishing alcohol to underaged consumers." *Id*. Barkhurst argues that if the Board, a mere landowner, was deemed to have a duty in *Hernandez*, then *a fortiori* The Kingsmen's promotion of the Dambar Entertainment as part of its sponsorship of Rodeo Days should impose a like duty here. We disagree.

¶14        The Board of Regents' potential liability in *Hernandez* stemmed from the Board's ownership of the property and knowledge of underage drinking at fraternity events.[5] It is this aspect of control over the property that helped develop a relationship between the parties. Here, Barkhurst does not allege that The Kingsmen owned the Dambar and leased it to an operator knowing that minors or intoxicated patrons were regularly served alcohol on the premises. The Kingsmen had no ownership or landlord control over the property, or any other relationship with the Dambar that would give it authority and power to control the Dambar Entertainment. Based on the differences in theories of liability and facts present in *Hernandez* from those raised by Barkhurst, *Hernandez* does not require a determination that The Kingsmen owed a duty to Barkhurst.

¶15        Barkhurst also relies on *Markowitz v. Arizona Parks Board*, 146 Ariz. 352, 706 P.2d 364 (1985). That case, however, is readily distinguishable. There, the supreme court determined that the State, as possessor of the land where a park visitor injured himself while cliff diving, owed such invitees a duty of reasonable care to provide safe premises. *Markowitz*, 146 Ariz. at 354, 355, 706 P.2d at 366, 367. Barkhurst has not argued a premises liability theory here.

¶16        Barkhurst's reliance on *Rudolph v. Arizona B.A.S.S. Federation*, 182 Ariz. 622, 898 P.2d 1000 (App. 1995), is also misplaced. There, a fishing contest participant injured a jet skier, and this Court determined

---

[5]        In addition, the plaintiff in *Hernandez* advanced theories of *respondeat superior* and negligent supervision because the Board of Regents had arranged to have a student acting as its agent at the party to prevent underage drinking. *Hernandez*, 172 Ariz. at 526, 838 P.2d at 1287. Here, Barkhurst contends The Kingsmen was directly liable for his injuries; he does not argue *respondeat superior,* which is a derivative theory of liability.

that the sponsor of the contest owed a duty of due care to the skier. *Rudolph*, 182 Ariz. at 623-24, 898 P.2d at 1001-02. However, in *Rudolph*, unlike here, the fishing club not only sponsored the event, and designed and conducted the tournament, but also assumed a duty of care over the area by obtaining a government permit that specifically required the sponsor to ensure the safety of persons around the lake: "[t]he permittee shall assure that all participants operate boats in a safe and reasonable manner without endangering the peace and safety of other persons in and about the lake." *Id.* at 623, 898 P.2d at 1001. Thus, the sponsor's control over the property and the event helped develop a relationship between the parties. Neither factor is present in this case.

**¶17**　　　　Finally, Barkhurst relies on *Weirum v. RKO General, Inc.*, 539 P.2d 36, 38, 40 (Cal. 1975), to support his duty argument. However, that case is also distinguishable from the facts here.[6] In *Weirum*, the court found that a radio station owed a duty of care to a driver who was forced off the road by youthful motorists racing to find a mobile disc jockey giving away cash prizes. *Id.* In that case, however, the radio station was in complete control of the event—it was responsible for the rules, the format, and the execution of the contest. Such a level of control over the event was not present in this case. Furthermore, the court found a duty based on a finding of foreseeability which is no longer the proper standard for determining duty in Arizona. *See Gipson*, 214 Ariz. at 144, ¶¶ 15-17, 150 P.3d at 231.

**¶18**　　　　Ultimately, The Kingsmen sponsorship of the Rodeo Days did not create a special relationship between it and Barkhurst. Our position is also supported by *Vogel v. West Mountain Corp.*, which found that mere sponsorship of an athletic event, absent control, was insufficient to establish a duty to the participants:

---

[6]　　In the superior court, Barkhurst also cited two cases from other jurisdictions to support his duty argument. Both of those cases are also distinguishable. *See Marshall v. Burger King Corp.*, 856 N.E.2d 1048, 1058-59 (Ill. 2006) (holding that owner and operator of restaurant had duty to protect invitee from harm caused by driver of vehicle who lost control of car in restaurant parking lot); *Rodriguez v. Solar of Mich., Inc.*, 478 N.W.2d 914, 921-22 (Mich. Ct. App. 1992) (holding that sponsor of holiday party who hired caterer to serve liquor and had control over serving of liquor to underage persons and might have encouraged serving minors with liquor had duty to third person injured by inebriated minor after leaving the party).

> [S]ponsorship alone, absent "control over the design of the course, the supervision of the race, or the qualifications of entrants" was insufficient to impose liability for injuries sustained by a participant.

97 A.D.2d 46, 47-48 (N.Y. App. Div. 1983) (citation omitted).  Here, as in *Vogel*, because The Kingsmen neither owned nor controlled the operation of the Dambar, and was not in a position to assume control, "the existence of a duty has not been established."  *Id*. at 50.

**¶19**　　　Barkhurst also argues that even if the relationship it contends existed between the parties did not give rise to a duty, public policy supports finding a duty on the part of The Kingsmen to prevent the serving of alcohol to underage minors.  As we understand his argument, Arizona's policy to prevent underage drinking should create a duty upon persons who sponsor and promote events at which liquor is served to prevent serving underage patrons.

**¶20**　　　In the context of this case, we disagree.  As the Arizona Supreme Court made clear in *Gipson*, the adoption of a no-duty rule generally is based on "concerns that potential liability would chill socially desirable conduct or otherwise have adverse effects."  214 Ariz. at 146, ¶ 29, 150 P.3d at 233.  This chilling effect includes holding social hosts liable for harm caused by guests to whom they served alcohol, which might curb desirable social exchanges.  *Id*.; *see also Keckonen v. Robles*, 146 Ariz. 268, 272, 705 P.2d 945, 949 (App. 1985) ("We do not believe that reasonable persons would extend to the social host the liability imposed upon the tavern keeper. The consequences of imposing such a duty are economically and socially staggering."); *Vogel*, 97 A.D.2d at 50 ("[T]o extend legal liability over a sponsor of an athletic event would prove an undue expansion of the sponsorship relationship, the net result of which would be to discourage further participation."). As a matter of public policy, imposing a duty on a group which is not a social host but merely a promoter of events, such as here, would chill socially desirable conduct when the group is not controlling, organizing or supervising a specific event held by third parties.  In essence, any city, town or organization that promoted or sponsored celebrations such as for the Fourth of July would have a duty to protect persons attending events controlled by local businesses holding related events simply because the businesses were sponsors of the celebration.  Similarly, towns or organizers of major professional or national collegiate sporting events in which local businesses became sponsors would have a duty to protect persons attending related events held by those businesses from underage

attendees served liquor by the businesses even if the city or organizer of the umbrella event had no control over the serving of liquor.[7] Such a duty would chill the ability of the municipalities or promoters to hold general holiday celebrations or a national sporting event. Nor would such a duty advance the policy objectives behind restrictions imposed on serving alcohol to intoxicated or underage patrons, which are sufficiently addressed by dram shop liability imposed on tavern owners and other licensees.

¶21 On this record, based on the absence of authority supporting Barkhurst's argument regarding the existence of a duty under the circumstances present in this case, and for public policy reasons, we hold The Kingsmen, by merely sponsoring and promoting Rodeo Days without any control or right to control the Dambar or the Dambar Entertainment, did not owe a duty to Barkhurst to protect him from harm. Accordingly, we affirm the dismissal of Barkhurst's claims against The Kingsmen.

II. AGENCY

¶22 Barkhurst separately argues the Dambar was the apparent agent of The Kingsmen, and consequently the latter is liable for the Dambar's alleged violations that occurred in this case. Barkhurst did not raise this argument in the superior court. We generally do not consider arguments and legal issues on appeal that have not been specifically presented to the superior court. *See Trantor v. Fredrikson*, 179 Ariz. 299, 300, 878 P.2d 657, 658 (1994) (stating that a party must have afforded the superior court and opposing counsel the opportunity to correct any asserted defects in order to contest on appeal); *see also Schoenfelder v. Ariz. Bank*, 165 Ariz. 79, 88, 796 P.2d 881, 890 (1990) (noting that a party waives on appeal any argument not properly presented in the superior court); *Airfreight Express Ltd. v. Evergreen Air Ctr., Inc.*, 215 Ariz. 103, 109-10, ¶ 17, 158 P.3d 232, 238-39 (App. 2007) (party waives argument raised for first time on appeal when the superior court had no opportunity to address the

---

[7]     Because The Kingsmen did not provide the liquor at the Dambar Entertainment, we do not need to address whether a social host has a duty to prevent serving underage patrons based on public policy. *See Gipson*, 214 Ariz. at 146, ¶ 28, 150 P.3d at 233.

issue on its merits).  Consequently, Barkhurst has waived this argument, and we do not address it. [8]

### III.    ATTORNEYS' FEES ON APPEAL

**¶23**        The Kingsmen request  attorneys' fees on appeal pursuant to A.R.S. §§ 12-341.01 (Supp. 2013) and -349 (Supp. 2013).   We deny the fee request under A.R.S. § 12-341.01 because this case does not arise out of contract.   With respect to the other basis for their fee request, The Kingsmen essentially contend this appeal is "without substantial justification."  A.R.S. § 12-349(A)(1).  Nothing in the record indicates the appeal was not pursued in good faith.  *See* A.R.S. § 12-349(F) (providing that "'without substantial justification' means that the claim or defense is groundless *and* is not made in good faith." (emphasis added)).   We therefore deny the request for fees on this basis.

### CONCLUSION

**¶24**        For the foregoing reasons, we affirm the judgment dismissing Barkhurst's negligence claim against The Kingsmen.



Ruth A. Willingham · Clerk of the Court
FILED: MJT

---

[8]        In his reply brief, Barkhurst points to statements he made at the hearing on the summary judgment motion that he contends illustrate an "apparent agency" argument properly made in superior court, and thereby preserving the issue.  Read in context, however, the statements made in superior court did not go to any apparent agency issue; rather, Barkhurst made the statements to illustrate The Kingsmen "sponsored all of the events that are associated with . . . rodeo week."